**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GWINNETT COUNTY NAACP, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS, *et al.*,<br><br>*Defendants*. | CIVIL ACTION<br><br>FILE NO. 1:20-cv-00912-SDG |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

Early voting for the Presidential Preference Primary began at 7:00 am this morning at the Gwinnett Elections Office, the schedule set by the Board of Commissioners on February 4, 2020. In one week, early voting will begin at six additional locations—and continue every day until March 20. But that is not enough for Plaintiffs, who now seek to involve this Court in questions of the location and timing of early voting, alleging that it is a *constitutional* violation to not have all of the satellite locations open for seven additional days.

This Court should deny the Plaintiffs' motion because Plaintiffs cannot show that any of the four prongs for a preliminary injunction are met. This case is not appropriate for federal-court jurisdiction because it seeks to have this Court decide administrative details of an election down to the street address where early voting will take place. Plaintiffs cannot show any irreparable harm. And Plaintiffs have not exercised reasonable diligence—they knew the schedule for early voting was officially set on February 4 and waited until after the close of business on February 27 to file this lawsuit. Plaintiffs have further failed to allege a sufficient injury to show any standing because their entire imagined injury is based on speculation and because no voter has an absolute right to vote in a particular manner. This Court cannot fashion effective relief and the entire case should be dismissed.

## FACTUAL BACKGROUND

### I. Relevant history of voting in Gwinnett County.

Gwinnett County has more than 550,000 registered voters. Declaration of Lynn Ledford ("Ledford Dec."), attached as Ex. A, at ¶ 3. Voter turnout for the last several general elections has been high—314,918 Gwinnett County voters voted in the 2018 general election and 325,636 Gwinnett voters voted in the 2016 presidential election. *Id.* at ¶ 14. Turnout in past Presidential Preference Primaries (the "PPP") has been significantly lower, however, with

Gwinnett turnout in the 2016 PPP at 156,135 voters even when both major political parties had contested races for President. *Id*. The most recent PPP similar to the 2020 election was 2012, when only one party had a contested race. In that year, only 79,622 Gwinnett County voters voted, or about 25% of the 2018 turnout. *Id*.

Gwinnett County provides the state-mandated three weeks of early voting prior to federal and state elections. *Id*. at ¶ 4. Although the state law requires only one location per county, Gwinnett County historically opened multiple satellite locations to make it easier for its citizens to vote. *Id*.

In 2016, Gwinnett County utilized one location for the first week of early voting. Then, during the second week of early voting, it opened one satellite location in addition to the main office location. *Id*. at ¶ 5. For the third week of early voting, the County opened six satellite locations in addition to the main office location. *Id*. at ¶ 5. After seeing the overwhelming popularity of early voting in 2016, in 2018, Gwinnett County utilized one location for the first week of early voting (the main elections office) and six satellite locations in addition to the main office location for a total of seven voting locations for both the second and third weeks of early voting. *Id*. at ¶ 6. It used the same early voting schedule for the Transit Referendum in 2019. *Id*.

The Gwinnett County Commission must approve all of the expenditures for early voting outside of budgeted funds. *Id*. at ¶ 7. In 2020, the Gwinnett Board of Registrations and Elections ("BORE") submitted a budget request outside of the regular budget process to fund seven satellite locations for all three weeks of early voting. *Id*.

On February 4, 2020, the Gwinnett County Commission voted to utilize the same early-voting schedule as in previous years, with one week at the main elections office, then the next two weeks with six satellite locations in addition to the main office all open from 7am to 7pm, including Saturdays and Sundays. *Id*. at ¶ 8. This approach provides more hours of early voting opportunities than Gwinnett County has ever provided to its voters. *Id*.

The County has advertised the dates, times and locations for early voting in 2020 publicly throughout Gwinnett County since February 4. *Id*. at ¶ 9. Those advertisements consistently notify voters that, from March 2 through March 20, early voting will be available at the main elections office and that from March 9 through March 20, early voting will be available at the six satellite locations. *Id*.

## II. Preparation for the PPP.

As this Court is aware, Georgia is in the process of rolling out its new Dominion Ballot-Marking Devices (BMDs) to replace its old electronic voting

machines.[1] The new BMDs use more power than the old machines and several early-voting locations in Gwinnett County require upgrades to their electrical capacity. *Id.* at ¶ 10. Several of the satellite locations are having their electrical power upgraded this week to prepare for the planned March 9 opening of those locations. *Id.*

Managing the PPP is a massive logistical task. The six satellite locations require 364 pollworkers to operate them. *Id.* at ¶ 11. While those workers are trained and ready to start on March 9, there is no provision for an earlier opening time for the satellite locations. *Id.* In addition, opening the locations requires the delivery and setup of 105 BMDs. *Id.* at ¶ 12. Even if the electrical upgrades were complete, delivering those units is a logistical challenge for which the County has not prepared.[2] *Id.*

## III. Procedural background.

By their own admission, Plaintiffs have known of the decision of the Board of Commissioners for weeks. They attended the BORE meeting on January 21. They sent letters on January 22 and February 18. [Doc. 2-13].

[1] See generally *Secure the Vote*, https://securevotega.com/

[2] Plaintiffs propose that there is an easy solution—use paper ballots. But that still requires the pollworkers, delivery of large optical-scanner ballot boxes, and printing of sufficient ballots, none of which can take place on the schedule Plaintiffs propose. *Id.* at ¶ 13.

They served Open-Records Act requests, as shown by the number of emails they attached to their motion. [Docs. 2-10, 2-11, 2-12]. And still they waited.

Plaintiffs filed this action after the close of business on February 27, 2020. [Doc. 1]. This Court scheduled a hearing for March 2, 2020 at 2:00pm and allowed this response by 10:00am. [Doc. 4].

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiffs have not shown that any of the prongs of a preliminary injunction are met. Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) quoting *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989).

When a court issues a preliminary injunction, it must find all of the four requisites are met: "(1) [a] substantial likelihood of success on the merits of their claims; (2) [that Plaintiffs] will likely suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). Preliminary injunctions are never granted as of right, even if a plaintiff can show a

likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). The extraordinary nature of the relief sought by Plaintiffs is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S. Ct. 5 (2006).

## I. Plaintiffs fail to meet any of the four requisites necessary for a preliminary injunction.

### *A. Plaintiffs cannot show any likelihood of success on the merits.*

#### 1. Plaintiffs' claims fail because this Court lacks jurisdiction to involve itself in the administrative details of elections.

Plaintiffs' sole claim—that they have a constitutional right to six additional early voting locations for one week—has no basis in law and is well beyond the jurisdiction of this Court to grant. And although plaintiffs cavalierly ask this Court to invade the province of state and local election officials, federal law is clear: The U.S. Constitution specifically reserves most authority regarding the integrity and efficiency of elections to the states. U.S. Const. Art I, §§ 2 and 4. It is the rare case when federal courts involve themselves because:

> the States have evolved comprehensive, and in many respects, complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, manner of holding primary and general elections.

*Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). The administration of local elections and early voting procedures is the responsibility of local officials and is not the job of the courts. *Ohio Democratic Party v. Husted,* 834 F.3d 620 (6th Cir. 2016). "It's as if Plaintiffs disregard the Constitution's clear mandate that the states *(and not the courts)* establish election protocols, instead reading the document to require all states to maximize voting convenience." *Id.* at 629 (emphasis added).

"Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or *supervise the administrative details of a local election*." *Curry v. Baker,* 802 F.2d 1302, 1314 (11th Cir. 1986) (emphasis added). Why is this? Because "the framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); see also, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (voters do not have an absolute right to vote in any way they choose). "Only in *extraordinary circumstances* will a challenge to a state election rise to the level of a constitutional deprivation" or in instances where the "very integrity of the

electoral process" is called into question. *Curry*, 802 F.2d at 1314, 1316-1317 (emphasis added).

This is not a case that calls the "very integrity of the electoral process" into question. "The Constitution does not require *any* opportunities for early voting and as many as thirteen states offer just one day: Election Day." *Husted,* 834 F.3d at 623. "While it may be true that having to drive to an early voting site and having to wait in line may cause people to be inconvenienced, inconvenience does not result in a denial of 'meaningful access to the political process'." *Jacksonville Coalition for Voter Protection v. Hood,* 351 F. Supp. 2d 1326, 1336 (M.D. Fla. 2004). The *Hood* court found it did not have the authority to order the opening of additional early voting locations based solely on the convenience of voters. *Id.*

Yet this is precisely the impermissible intervention in local elections Plaintiffs seek in this case. Plaintiffs assert that Gwinnett voters somehow have a constitutional right to six additional early voting sites during the first week of advance voting in order to prevent voters from having to wait in "exceptionally long lines" and to not "strain voters who wish to exercise their right to vote." [Doc. 2-1, p. 16]. Like the Court in *Hood*, this Court lacks the authority to order the opening of additional early voting sites based merely upon Plaintiffs' alleged inconvenience. Significantly, Plaintiffs do not allege

that Gwinnett County's early voting regimen violates the Constitution or is illegal. Rather, Plaintiffs seek Court intervention based solely on alleged inconvenience and unfounded speculation of long lines during the first week of early voting for this year's PPP.

While popular with voters, voting in advance of an election is not a constitutionally protected right. In *Husted,* the plaintiffs challenged the Ohio law decreasing the number of early voting days from thirty-five days to twenty-nine days. The *Husted* court held that the new Ohio law "affording abundant and convenient opportunities for all Ohioans to exercise their right to vote, is well within the constitutionally granted prerogative and authority of the Ohio legislature to regulate State election processes." *Id.* at 640 (referring to early voting as a privilege not a right).

The Georgia Election Code specifically leaves the decision as to the number of early voting sites to county officials, not the courts. O.C.G.A. § 21-2-385(d)(1) mandates that local election officials conduct early voting during the three weeks leading up to the week of a primary election, however, the provision of "additional voting locations" is expressly for the counties and municipalities to determine based upon what "suit[s] the needs of the electors of the jurisdiction at their option." O.C.G.A. § 21-2-385(d)(1)(D). Here, Plaintiffs do not contend that Gwinnett County's early voting schedule

violates state election law because it does not. Gwinnett County's early election schedule actually *exceeds* the requirements of state law by providing six additional voting locations for the second and third weeks of the advance-voting period for the PPP, rather than just the required single location.

Gwinnett County did not grant a right only to take it away. The County's governing body selected the option that worked best given the administrative details and likely lower turnout in a PPP, exercising their statutorily delegated option to provide for their citizens. Gwinnett County is providing all seven locations for two full weeks of early voting and a single location for all three weeks. The review of that administrative election decision is completely inappropriate for a federal court and should result in the denial of the motion and the dismissal of this case for want of jurisdiction.

2. Plaintiffs cannot succeed because Gwinnett County is complying with a state law Plaintiffs do not challenge.

Even if this Court has jurisdiction, the County is in full compliance with Georgia law and Plaintiffs do not challenge the constitutionality of that law—only the decisions of the County. As described above, Georgia law requires that advance voting shall commence "on the fourth Monday immediately prior to each primary or election." O.C.G.A. § 21-2-385(d)(1)(A). As described above, on February 4, the Gwinnett Commission adopted the

early voting schedule the Gwinnett BORE operated under during the 2018 elections and last year's transit referendum. Plaintiffs' contention that they are "seek[ing] to ensure that voters in Gwinnett County have access to satellite locations for early voting . . . to prevent potential disenfranchisement," [Doc. 2, p. 4], does not make sense because every Gwinnett County voter is free to vote. Moreover, Gwinnett County is offering voters the early voting schedule utilized in the record-setting 2018 elections notwithstanding the fact that voter turnout is likely to be far lower in a PPP where only one major political party has a contested primary.

3. Plaintiffs are not likely to succeed because there is no impermissible burden on the right to vote.

The evaluation of voting regulations under the right to vote takes place under a sliding scale, which considers the alleged burden against the interest of government. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

In this case, Plaintiffs' sole argument is that missing seven additional days of early voting *at satellite locations* somehow places a constitutionally impermissible burden on the right to vote. But as Defendants have already demonstrated, Gwinnett County provides far more early voting than is required by the statute. Not only is this a minimal burden, it is more than justified by the County's important regulatory interests: It decided on the schedule for early voting accounting for the readiness of facilities for the BMDs, the budgetary requirements, and the number of poll workers, while considering the likely turnout in the PPP. *See generally* Ledford Dec.; *Burdick*, 504 U.S. at 434. Plaintiffs have not and cannot show that there is an unconstitutional burden on the right to vote and the argument that early-voting opportunities were taken away is belied by the record and the facts about the administration of the PPP.

4. Plaintiffs are not likely to succeed because they seek a mandatory injunction.

The Plaintiffs are seeking relief from this Court that extends far beyond the limitations of a preliminary junction. Plaintiffs seek to impose specific elections procedures starting *today*. Mandatory injunctions are "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243

(5th Cir. 1976).[3] The facts and law do not clearly favor Plaintiffs and this Court should deny their motion.

*B. There is no irreparable harm.*

Plaintiffs have not sufficiently shown any irreparable harm to the voters of Gwinnett County. Their sole basis for a possible harm is the abstract potential for long lines [Doc. 2-1, p. 23] and (somehow) the alleged prevention from voting [Doc. 2-1, p. 24]. But Plaintiffs have no basis for those alleged harms, because they intentionally compare extremely high turnout elections with the PPP.

In 2016, both political parties had competitive presidential primaries and 156,135 Gwinnett voters cast a ballot in the PPP. Ledford Dec. at ¶ 14. Later that year, 325,636 Gwinnett voters participated in the November General Election. *Id*. In 2012, the last time an incumbent president ran for re-election, only 79,622 Gwinnett voters cast a ballot in the PPP. *Id*.

Plaintiffs attempt to compare what will likely be a low-turnout PPP to the 2018 mid-term[4] and 2016 presidential elections. Comparing the events of

---

[3] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

[4] Experts widely agreed that 2018 was an extremely high turnout for a mid-term election. As Professor Michael McDonald noted in the New York Times,

November 2018, including long wait times and technical difficulties, to a PPP that will have only one competitive primary is comparing apples to oranges and does not demonstrate any irreparable harm.

From March 2, 2020 to March 24, 2020, voters in Gwinnett County will have a variety of opportunities to vote in the PPP:

- Advance voting at the main elections office from March 2 through March 20 (including Saturdays and Sundays);
- Advance voting at the main elections office and all six satellite locations from March 9 through March 20 (including Saturdays and Sundays);
- Absentee-by-mail without excuse under Georgia law; and
- In-person voting at their home precinct on March 24, 2020.

Plaintiffs' conclusion that there is an irreparable harm to Gwinnett voters in the face of so many options for voting strains credulity. With such an immense number of opportunities to make their voices heard, there is no imminent, irreparable harm to a single Gwinnett County voter who chooses to participate in the PPP and Plaintiffs cannot point to a single voter who is

---

"[w]e're in uncharted territory with the size of [the 2018 general election] vote." Audrey Carlsen, *Early Voting in 28 States Has Surpassed 2014 Levels*, N.Y. Times (Nov. 6, 2018).

unable to participate in the PPP if he or she chooses. See *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (no burden when plaintiffs unable to identify single voter adversely affected).[5]

Plaintiffs also cannot show any irreparable harm because Gwinnett County has *never* offered satellite locations in the first week of early voting. Ledford Dec. at ¶¶ 5-6. While the BORE requested an additional week this year, the approval of the Advance Voting schedule on February 4, 2020 only included the satellite locations for the final two weeks of early voting. *Id*. at ¶ 7-8. Therefore, Plaintiffs' request for this Court to "reinstate" the satellite locations for the week of March 2 is a mischaracterization of the facts and cannot form the basis for any irreparable harm.

*C. The equities and public interest strongly favor Defendants.*

The third prong requires Plaintiffs to bear "the burden of persuasion" that the "threatened injury to the movant outweighs whatever damage the

---

[5] Plaintiffs' position is made more untenable when considering the larger context. According to the National Conference of State Legislatures, 39 states and the District of Columbia allow some form of early voting. However, nine states—Alabama, Connecticut, Kentucky, Mississippi, Missouri, New Hampshire, Pennsylvania, Rhode Island, and South Carolina—do not offer *any* early voting opportunities. National Conference of State Legislatures, "*State Laws Governing Early Voting*," Aug. 2, 2019, https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx

proposed injunction may cause the opposing party." *McDonald's Corp.*, 147 F. 3d at 1306. The fourth prong considers whether the requested injunction is in the public interest. *Id.* Litigation involving elections is unique because of the interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is no time to resolve factual disputes. *Id.* at 5–6. A party requesting a preliminary injunction, particularly in the election context, must exercise "reasonable diligence" in bringing their case. *Benisek*, 138 S. Ct. at 1943–44. The equities and the public interest here weigh heavily in favor of the County.

Plaintiffs knew the early-voting schedule for weeks prior to the filing this lawsuit. The Commission adopted the schedule the first part of the year, as they acknowledge [Doc. 2-1, pp 8-11]. Instead of taking any meaningful action, Plaintiffs sent multiple letters and waited [Doc. 2-1, pp. 9-10].

While Plaintiffs waited, the County moved forward with its adopted schedule, advertising the early voting schedule for voters and preparing the electrical upgrades consistent with that duly promulgated schedule. Ledford Dec. at ¶¶ 9-10. Plaintiffs now seek an immediate rollout of 105 BMDs and 364 poll workers to six locations that are not even fully ready for operation. The Plaintiffs did not exercise reasonable diligence while the County

prepared for the PPP and cannot now complain that they ask for something that cannot be done.

Plaintiffs have only their delay to blame for making it impossible for this Court to order the relief they seek. The current, approved timeline allows for a timely early voting rollout at the six remaining satellite locations on schedule a week from today. To change the schedule now, after approval from the County's governing body and preparation of election officials, would create a tremendous expense to the taxpayers and risk extreme voter confusion.

The public interest favors denying the injunction. Gwinnett County voters have the full three weeks of early voting available to them as provided by Georgia law, plus two full weeks of additional opportunities. Plaintiffs have only themselves to blame for their resource allocation—especially because their pleadings indicate they were well aware of the Commission vote. [Doc. 2-1, pp. 9-10]. This Court should deny the requested injunction and allow the orderly process of elections to go forward because Plaintiffs made a tactical decision not to exercise reasonable diligence. *Benisek*, 138 S. Ct. at 1943–44; *Purcell*, 549 U.S. at 4.

## II. The Motion should be denied and the case should be dismissed because Plaintiffs lack standing.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. Art. III § 2. The long-established doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). In order to establish standing to sue, a plaintiff must satisfy three criteria: (1) demonstrating injury in fact; (2) showing a causal connection between the injury and the challenged action that is fairly traceable to the defendant's conduct; and (3) establishing that it is likely that a favorable judgment will redress her injury. *Lewis v. Governor of Alabama,* 944 F. 3d 1287, 1296 (11th Cir. 2019). These standing requirements apply to all would-be plaintiffs, including organizations or individuals.

For organizations, the requirements apply whether plaintiffs seek standing through an associational or organizational theory. In order to establish standing, "[a]n organization may demonstrate a concrete, imminent injury either through a 'diversion-of-resources' theory or through an associational-standing theory." *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (2018), citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). Here the Plaintiffs claim to

have standing under both theories. [Doc. 2-1, pp. 13-15]. For the reasons that follow, Plaintiffs miss the mark.

*A. Plaintiffs do not have direct organizational standing.*

Plaintiffs lack direct organizational standing because they have not alleged that any actions of Defendants caused them to divert resources from their primary mission. Plaintiffs contend they are entitled to standing because "[o]rganizations engaged in get out the vote activities have standing to sue when a defendant illegally impairs those activities, forcing the organizations to divert time, money and staff resources to educate and assist impacted voters." [Doc. 2-1, p. 13], citing *Arcia,* 772 F. 3d at 1341–1342.

Despite the framing of their allegations, Plaintiffs have not actually described or alleged any diversion of resources whatsoever. Instead, Plaintiffs assume that doubling down on their primary mission constitutes such a diversion. *See* [Doc. 1 at ¶¶ 12–14]. But Plaintiffs' conclusory use of the magic word "divert" does not mean their actions rise to a level sufficient to accord standing.

"Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts *impair the organization's ability to engage in its own projects* by forcing the organization to divert resources in response." *Crittenden,* F. Supp. 3d at 1336 (emphasis added). Rather than

diverting resources, Plaintiffs are simply continuing their long-established mission. Moreover, Plaintiffs diversion-of-resources theory suffers from two more basic shortcomings: 1) Plaintiffs cannot provide any evidence that the satellite early voting locations were, in fact, approved by the required governmental bodies for the first week of early voting and that such approval was subsequently revoked; and 2) Plaintiffs fail to demonstrate the decision by Defendants to approve the satellite early voting locations for the second and third of early voting violates any Georgia law or federal requirement.

The Plaintiffs apparently assumed, wrongly, that voting would occur at satellite locations in Gwinnett County during all three weeks of early voting and decided to operate under that faulty assumption. *See, e.g.,* [Doc. 2-4 at ¶¶ 9-11]. That their assumption turned out to be incorrect does not constitute an injury, but rather more closely approximates regret in how each organization allocated its own discretionary resources. Defendants owe no legal duty to Plaintiffs to guarantee they are satisfied with the consequences of their own decisions. This alone should halt Plaintiffs' claim to organizational standing. But the sheer absence of unlawful conduct by the Defendants further demonstrates this Court has no jurisdiction.

As this Court noted in *Crittenden,* direct organizational standing requires diversion of resources triggered by an *illegal* act of the defendants

that impairs the organization's ability to engage in its own projects. *Id.* But Plaintiffs fail to allege any instance where the Defendants actually *violated* any statute. In-person early voting in Gwinnett County will begin precisely as dictated by O.C.G.A § 21-2-385(d)(1). And to the extent additional voting locations are provided due to the level of voter turnout, the decision to do so and the manner in which this action may be carried out rests entirely within the *discretion* of Defendants. *See* O.C.G.A. § 21-2-385(d)(1)(D).

Even if this Court concluded Plaintiffs diverted resources as a result of Defendants' actions, which they did not, the absence of unlawful action on the part of Defendants renders any such diversion purely discretionary and outside the scope of Article III standing. Accordingly, the Plaintiffs cannot bring this claim based on direct organizational standing.

*B. Plaintiffs have not established associational standing.*

Under an associational-standing theory, "[a]n organization has standing to enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). Plaintiffs have failed to establish that any of their members

would have independent standing to bring this lawsuit, and accordingly cannot rely on associational standing to bring their claims.

An organization must show "that its members 'face[] a probability of harm in the near and definite future' to establish injury that is sufficient to confer standing to seek prospective relief." *Crittenden,* 347 F. Supp. 3d at 1336, quoting *Browing,* 522 F. 3d at 1160-61. In other words, associational standing requires Plaintiffs show two things, neither of which they are capable of showing: (1) Plaintiffs must demonstrate a "probability of harm" as a result of Defendants' actions; and (2) such harm must occur in the "near and definite future." *Id.*

First, no voters in Gwinnett County—and thus no individual members of the Plaintiffs—have any reasonable probability of harm from Defendants' early-voting schedule. Throughout their Brief, Plaintiffs claim early voting satellite locations were suddenly "cut" after being decided upon by Defendants. They further claim there is bipartisan support to "restore" these early voting satellite locations. [Doc. 2-1, p. 12]. But the reality is that opening the satellite locations during the first week of early voting was never set by Defendants. To the extent Plaintiffs disagree with this characterization, the material they cite in their Motion belies their position. *See, e.g.*, [Doc. 2-1, p. 10]. To be sure, Gwinnett County cannot "cut" or

"restore" anything that was never there in the first place. Thus, there cannot be any harm to Plaintiffs.

Plaintiffs are obviously disappointed that Defendants are not providing the amount of early voting satellite locations that Plaintiffs would like during the times they would like to have them. But this disappointment does not amount to a legal harm. While the Supreme Court has long noted the right to vote is fundamental, "[i]t does not follow, however, that the right to vote in any manner… [is] absolute." *Burdick*, 504 U.S. at 433. Moreover, each legal requirement placed on Defendants by state and federal law is plainly satisfied here. Because there is no legal harm, Plaintiffs cannot show that their members have a "probability of harm" for purposes of standing. But even if Plaintiffs could demonstrate a probable harm, such harm still lacks the requisite imminence to afford Plaintiffs standing.

As earlier noted, Plaintiffs must show the alleged harm to their members will occur in the "near and definite future." *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568, U.S. 398, 410 (2013) (rejecting "reasonable likelihood" of injury as sufficient to meet the injury-in-fact standard). Plaintiffs claim associational standing based on the possibility of some of their unidentified members standing in long lines. [Doc. 2-1, pp. 14-15]. But

this harm is speculative and far too tenuous to support Article III standing, especially given the turnout numbers cited above.

To constitute injury in fact for purposes of standing, a plaintiff must establish that the threatened injury is "certainly impending." *Whitmore v. Arkansas,* 495 U.S. 149 (1990) *citing Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979). A plaintiff cannot rely on "a highly attenuated chain of possibilities" to satisfy the requirement that future injury is "certainly impending." *Clapper,* 568 U.S. at 407 (2013); *see also Lujan,* 504 U.S. at 565, n. 2. Plaintiffs cannot meet these standards.

Many factors will contribute to the experience of Plaintiffs' members during early voting in the upcoming election, including voter turnout, the ability of voters to navigate the voting equipment, the training of poll workers, and even weather conditions. It is not for the parties or this Court to speculate how each of the individual factors will affect the voting experience in the upcoming election. Because these factors constitute a speculative chain of events, Plaintiffs' alleged harm is too remote to afford them standing.

## CONCLUSION

Plaintiffs ask this Court to exceed its own limited jurisdiction and invade local election decisions. Their Motion should be denied and their Complaint dismissed.

Respectfully submitted this 2nd day of March, 2020.

_/s/ Bryan P. Tyson_
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868 (telephone)

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13-point, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson