## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GWINNETT COUNTY NAACP, as an organization; GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; and GEORGIA COALITION FOR THE PEOPLES' AGENDA, INC., as an organization,<br><br>     Plaintiffs,<br><br>v.<br><br>GWINNETT COUNTY BOARD OF REGISTRATION AND ELECTIONS; JOHN MANGANO, STEPHEN DAY, BEN SATTERFIELD, BEAUTY BALDWIN, and ALICE O'LENICK in their official capacities as members of the Board of Registration and Elections; BEN KU, MARLENE FOSQUE, TOMMY HUNTER, CHARLOTTE NASH, and JACE BROOKS, in their official capacities as Gwinnett County Commissioners,<br><br>     Defendants. | Civil Action No.<br>1:20-cv-00912-SDG |

## OPINION AND ORDER

This matter is before the Court on Plaintiffs Gwinnett County NAACP ("Gwinnett NAACP"), Georgia State Conference of the NAACP ("Georgia NAACP"), and the Georgia Coalition for the Peoples' Agenda, Inc.'s ("GCPA") motion for a temporary restraining order and preliminary injunction [ECF 2]. The Court held a hearing on March 2, 2020 and **DENIED** Plaintiff's motion from the

bench. This Opinion and Order further explains the Court's reasoning for its ruling.

## I. BACKGROUND[1]

Gwinnett County is one of the fastest growing counties in Georgia.[2] As of February 1, 2020, Gwinnett County had more than 550,000 registered voters.[3] The voter turnout for the 2016 and 2018 presidential general elections was high, with well over 300,000 voters voting in each.[4] Defendant Gwinnett County Board of Registrations and Elections ("Gwinnett BORE" or "BORE") is responsible for the administration of elections in Gwinnett County.[5] The Gwinnett County Board of Commissioners ("Board of Commissioners"), through its individual members, controls Gwinnett BORE's budget and is responsible for providing the necessary funds and equipment to conduct elections.[6]

---

[1] These facts are taken from the Complaint, Plaintiffs' motion and supporting evidence, and Defendants' response and supporting declaration. ECF 1; ECF 2; ECF 10; ECF 11; ECF 13.

[2] ECF 1, ¶ 19.

[3] *Id*; ECF 11-1, ¶ 3.

[4] ECF 11-1, ¶ 14.

[5] ECF 1, ¶ 16.

[6] *Id*. ¶ 15; ECF 11-1, ¶ 7.

Each county in Georgia is required to conduct three weeks of in-person, early voting. O.C.G.A. § 21-2-385(d)(1). However, only one location for early voting in each county is required under state law. *Id.* In 2016, Defendants operated one voting location—the Gwinnett County Voter Registration and Elections Office ("BORE headquarters")—during the first week of the early voting period.[7] For the second week of early voting, Defendants had two satellite offices where registered voters could vote, in addition to voting at the BORE headquarters. For the third week of early voting in 2016, Defendants operated seven satellite voting locations in addition to permitting voting at the BORE headquarters.[8] In 2018, Gwinnett County again operated only one voting office during the first week of early voting, but operated seven additional satellite offices during each of the second and third weeks.[9]

During the first week of early voting in the 2016 general election, voters experienced long delays at the BORE headquarters.[10] Some prospective voters stood in line for up to five hours.[11] Other prospective voters may have left before

---

[7]    ECF 1, ¶ 22.

[8]    *Id.*

[9]    *Id.*

[10]   *Id.* ¶¶ 23–24.

[11]   *Id.* ¶ 25.

casting their ballots or were physically unable to vote.[12] Even after the BORE opened more satellite offices later that first week of early voting, voters reportedly still experienced wait times of over an hour.[13] Voters also experienced long wait times during the early voting period for the 2018 general election.[14]

In August 2019, the Gwinnett BORE made a budget request to the Board of Commissioners for funds to operate eight voting locations—the BORE headquarters and seven satellite offices—for all three weeks of the early voting period during the March 2020 presidential primary.[15] The Board of Commissioners approved the budget request as to the second and third weeks of the early voting period, but not the first week.[16] As a result, only one polling location—the BORE headquarters—would be open during the first week of early voting, as had been the case in 2016 and 2018.[17] The Gwinnett BORE announced the Board of Commissioners' decision at its meeting on January 21, 2020.[18] The

---

[12] *Id.* ¶¶ 26–27.

[13] *Id.* ¶ 28.

[14] *Id.* ¶ 30.

[15] *Id.* ¶ 32.

[16] ECF 11, ¶ 8.

[17] *Id.*

[18] *Id.* ¶ 37.

Board of Commissioners notified the public of this decision on February 4, 2020.[19] Plaintiffs attended the January 21 BORE meeting and subsequently sent Defendants letters on January 22 and February 18 disputing the decision.[20]

During the January 21, 2020 meeting, BORE explained that there would be 12 days of early voting at the satellite locations (instead of the 19 days proposed in the BORE's budget) because of a delay in delivery of the necessary voting-machines.[21] Two days later, Gwinnett BORE officials reportedly stated that budget cuts were responsible for the decision.[22] Plaintiffs also present evidence that the Gwinnett BORE had concerns "due to logistics with equipment, training staff and managing elections property" as rationales for reducing the locations for early voting.[23] Notwithstanding, Plaintiffs allege that, as of February 24, 2020, the Gwinnett BORE had received 2,247 of the 2,255 new voting machines.[24] Plaintiffs do not allege whether those machines had been tested and were ready to be put into immediate use as of that date.

---

[19] ECF 10, at 4.

[20] *Id.* at 5.

[21] ECF 1, ¶ 37.

[22] *Id.* ¶¶ 38–39.

[23] *Id.* ¶¶ 40–41.

[24] *Id.* ¶ 42.

On February 27, 2020, Plaintiffs filed the instant Complaint, asserting a claim under 42 U.S.C. § 1983.[25] They allege Defendants' decision to operate only one polling location during the first week of the early voting period violates the First and Fourteenth Amendments.[26] That same day, Plaintiffs filed their motion for temporary restraining order and preliminary injunction and requested an expedited hearing since the first week of early voting for the March 2020 presidential primary was set to start on March 2.[27] The Court set a hearing for March 2 at 2 pm, and directed that Defendants file any written response by 10 am that day. Defendants' response argued that Plaintiffs were not entitled to injunctive relief.[28] All parties were represented by counsel during the March 2 hearing and both sides presented live witness testimony.

## II.    DISCUSSION

### a.    Standing

As a threshold issue, Defendants argue that Plaintiffs—three associational organizations—lack standing to maintain this suit. Article III of the Constitution

---

[25]    *See generally id.*

[26]    *Id.*

[27]    ECF 2.

[28]    ECF 10.

limits federal courts to consideration of cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To invoke this Court's jurisdiction, Plaintiffs must have standing. *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008) (*citing Nat'l Alliance for the Mentally Ill, St. John's Inc. v. Bd. of Cty. Comm'rs*, 376 F.3d 1292, 1294 (11th Cir. 2004)). The standing inquiry is threefold:

> First, the plaintiff must demonstrate that she has suffered an "injury in fact"—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, the plaintiff must show a causal connection between her injury and the challenged action of the defendant—*i.e.*, the injury must be fairly . . . trace[able] to the defendant's conduct, as opposed to the action of an absent third party. Finally, the plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress her injury.

*Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (*citing Lujan*, 504 U.S. at 560–61 (internal citations and punctuation omitted)). "Where only injunctive relief is sought, only one plaintiff with standing is required." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) (citin*g Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)).

###### *i.*     **Injury in Fact**

For the first prong, this Court has held that "[a]n organization may demonstrate a concrete, imminent injury either through a 'diversion-of-resources' theory or through an 'associational-standing' theory."[29] *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (*citing Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014)). When injunctive relief is sought, "individual participation of the organization's members is not normally necessary. The nub is whether the members themselves would have standing." *Id.* (*citing Browning*, 522 F.3d at 1160). Indeed, because injunctive relief is prospective in nature, an organization need only show that its members "face[ ] a probability of harm in the near and definite future." *Browning*, 522 F.3d at 1160–61. Plaintiffs assert they have standing under both theories. The Court agrees.

###### 1.     **Direct organizational standing**

For the "diversion-of-resources" theory, "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Crittenden*, 347 F. Supp. 3d at 1336 (*citing Arcia*, 772 F.3d at 1341). *See also Common*

---

[29] The "diversion-of-resources" theory is also frequently referred to as "direct organizational" standing.

*Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1288–89 (N.D. Ga. 2018) ("It is well established that an organization can establish standing to sue on its own behalf where it can show the defendant's acts resulted in an impediment to the organization's mission or diversion of its resources.").

Plaintiffs here—all of which are organizations dedicated to increasing voter participation through advocacy and educating voters on election procedures— allege they will be directly harmed by being forced to divert their resources to other projects and initiatives to ensure voters are able to participate in the election.[30] In particular, the Court credits the testimony of Helen Butler, the Executive Direction of the GCPA, who testified that her organization will be required to divert additional resources to transport voters to and from BORE headquarters, the sole polling location in Gwinnett County for the first week of the early voting period.[31] This will, in turn, hinder GCPA's mission of promoting voter advocacy and turnout as a whole. This is sufficient for Plaintiffs to demonstrate an imminent and concrete injury. *Browning*, 522 F.3d at 1165 ("[A]n organization suffers an injury in fact when a statute compels it to divert more resources to accomplishing its goals. . . . [T]he fact that the added cost has

---

[30]   ECF 1, ¶¶ 12–14.

[31]   *Id*. ¶ 14.

not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." (internal citations and punctuation omitted) (*citing Crawford*, 472 F.3d at 951). *See also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding drain on organization's resources constitutes concrete and demonstrable injury to organization's activities); *Martin*, 341 F. Supp. 3d at 1334 ("Defendants cite to no authority that an organizational plaintiff *must* explain exactly how its resources will be diverted from one endeavor to another before sufficient injury can be shown.").

### 2.     Associational Standing

The Court also finds Plaintiffs have "associational standing." Under this theory, an organization:

> Has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Crittenden*, 347 F. Supp. 3d at 1336 (*citing Browning*, 522 F.3d at 1160).

To demonstrate an injury-in-fact under this theory, Plaintiffs "need not establish that all of their members are in danger of suffering an injury," but merely show that "at least one member faces a realistic danger of suffering an injury." *Arcia*, 772 F.3d at 1342. Indeed, when the alleged harm is solely prospective, the

Eleventh Circuit does not "require[ ] that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future." *Browning*, 522 F.3d at 1160. *But see Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018) ("We did not relax the requirement that an organization name at least one member who can establish an actual or imminent injury.") (*citing Arcia*, 772 F.3d at 1342).

Here, Butler testified that GCPA represents over 5,000 individuals, some of whom are registered Gwinnett County voters who intended to vote at one of the seven satellite locations that will not be operational during the first week of the early voting period. This future harm is "certainly impending," as the early voting period has commenced and Gwinnett County voters cannot vote at any of the satellite locations during the first week. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). While Butler did not read off a list of names, she specifically articulated that some Gwinnett County voters, who are represented by GCPA, will be harmed by Defendants' decision. This would be sufficient to allow the individual voters to sue in their own right. Accordingly, GCPA has associational standing.

Defendants, however, argue Plaintiffs lack "associational standing" because they only presume and speculate that voters will experience harm through an

uncertain chain of events. The Court disagrees. While Plaintiffs did not present the affirmative testimony of a prospective Gwinnett County voter, they presented sufficient evidence to show that at least one of their members will face a realistic probability of harm in the near and definite future. That is all that is required. *Crittenden*, 347 F. Supp. 3d at 1336. *See also Curling v. Kemp*, 334 F. Supp. 3d 1303, 1316 (rejecting defendants' argument that plaintiffs' allegations were "only a speculative, generalized fear, thus falling short of establishing a concrete injury" and finding plaintiffs sufficiently "allege the threat of future harm").

Moreover, the interest in the right to vote is germane to the purpose of each Plaintiff organization. Each is an advocacy group geared towards increasing voter education and turnout. Finally, neither the claim asserted nor the relief requested requires the participation of any individual voters.

Thus, Plaintiffs have demonstrated an injury-in-fact sufficient for the first element for standing.

### ii.    Causation

The parties do not contest that Defendants, through their decision to operate only one polling station during the first week of the early voting period, have caused Plaintiffs' alleged injury. The Court finds that at least some Gwinnett County voters intended to vote at a satellite location that will not be in operation

due to Defendants' decision. Indeed, it is clear this injury is "fairly traceable" to Defendants, as there is a direct connection between Defendants' actions and Plaintiffs' alleged harm. Thus, Plaintiffs have sufficiently demonstrated the second element for standing.

### *iii.* **Redressability**

Likewise, the parties do not contest that Plaintiffs' alleged injuries could be redressed by a favorable ruling of this Court. To be sure, the issuance of an injunction requiring Defendants to immediately begin operating seven satellite polling stations would resolve all of Plaintiffs' grievance. Therefore, Plaintiffs have sufficiently demonstrated the final element necessary for standing.

### b. **Temporary Restraining Order and Preliminary Injunction**

Plaintiffs seek injunctive relief based on Defendants' decision to offer in-person, early voting at only one location during the first week of the early voting period for the March 2020 presidential primary election.[32] Plaintiffs assert this decision violates the First and Fourteenth Amendments.

The standard for obtaining a TRO is identical to that for obtaining a preliminary injunction. *Windsor v. United States*, 379 F. App'x 912, 916-17

---

[32] ECF 1, ¶ 1.

(11th Cir. 2010).[33] To obtain injunctive relief, the moving party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). In determining whether a preliminary injunction is warranted, "a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

Nonetheless, a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Moreover, when a party seeks to affirmatively enjoin a state governmental agency, requiring it to perform a certain action, the "case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Martin v. Metro.*

---

[33] Under Eleventh Circuit Rule 36-2, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."

*Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1372 (N.D. Ga. 2002) (*citing Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976)). The court must also exercise greater caution when, as here, "the injunction will require detailed and continuous supervision over the conduct of that [government] subdivision." *Id.*

### i.    Substantial Likelihood of Success on the Merits

To establish a Section 1983 claim, Plaintiffs must demonstrate that (1) Defendants deprived them of a right secured by the Constitution, and (2) that the deprivation occurred under color of state law. *Arrington v. Cobb Cty.*, 139 F.3d 865, 872 (11th Cir. 1998). It is undisputed that Defendants acted under color of state law. Thus, the Court need only address whether Defendants' actions violated the Constitution.

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (*citing Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). *See also Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("[T]he right of suffrage is a fundamental matter in a free and democratic society. . . . [T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").

Although the right to vote is fundamental, "[i]t does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick*, 504 U.S. at 433 (1992) (*citing Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)). As a matter of constitutional law, States "retain the power to regulate their own elections." *Burdick*, 504 U.S. at 433 (*citing* U.S. Const. Art. I, § 4, cl. 1). The Supreme Court has held that:

> [G]overnment must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

*Burdick*, 504 U.S. at 433 (*citing Storer v. Brown*, 415 U.S. 724, 730 (1974)).

To achieve these objectives, States may enact "comprehensive and sometimes complex election codes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Each regulation "inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Id.* Nonetheless, a State's "important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id. See also Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) ("[S]tate legislatures may without transgressing the Constitution impose extensive restrictions on voting. Any such restriction is going to exclude . . . some people from voting; the constitutional question is

whether the restriction and resulting exclusion are reasonable given the interest the restriction serves.").

Given the Court's grave responsibility to balance these competing interests, it is unsurprising that "[c]onstitutional challenges to specific provisions of a State's election laws [ ] cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (*citing Storer*, 415 U.S. at 730). Courts examine a challenge to a State's regulation that allegedly burdens the right to vote under a balancing test colloquially known as the *Anderson-Burdick* test. Pursuant to that test, the Court:

> [M]ust first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789 (1983).

When a State's regulation "subjects the voters' rights to 'severe' restrictions," then the regulation "must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (*citing Norman v. Reed*,

502 U.S. 279, 289 (1992)). When the regulation instead only imposes "reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters," then the "State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008).

Reviewing the record and the evidence presented during the hearing, the Court finds Plaintiffs' asserted injury to be modest and slight. The Georgia legislature has enacted a comprehensive scheme governing early voting. Pursuant to O.C.G.A. § 21-2-385(d)(1), in-person early voting must begin "[o]n the fourth Monday immediately prior to each primary or election" and extends through the "Friday immediately prior to each primary, election, or runoff." Early voting must be "conducted during normal business hours on weekdays during such period and shall be conducted on the second Saturday prior to a primary or election" and "counties and municipalities may extend the hours for voting beyond regular business hours and may provide for additional voting locations . . . to suit the needs of the electors of the jurisdiction at their option." *Id.*

Plaintiffs do not challenge the validity of Georgia's regulatory scheme. Likewise, Plaintiffs do not allege that Defendants have run afoul of Georgia law. Instead, both sides agree that early voting is an exceedingly popular method by which voters, including those in Gwinnett County, exercise their right to vote. To that end, the record shows that Defendants have far exceeded the requirements of Georgia law by offering prospective voters the opportunity to early vote every weekend during the three-week period and operating seven satellite voting locations for the second and third weeks of the early voting period. The hours during which the polling locations are open extend both before and after normal business hours.[34] In fact, Defendants have actually increased—not decreased—the amount of early voting polling locations each election year since 2016. Nor do Plaintiffs contend that Defendants' failure to add additional satellite voting locations for the first week of early voting during the March 2020 presidential primary (1) was motivated by racial (or any other) animus or (2) has a disparate impact on any protected group.

Instead, it appears Defendants' willingness to exceed the statutory minimum in expanding access to early voting has provided Plaintiffs a basis for

---

[34]   ECF 11, ¶ 8.

arguing that Defendants are constitutionally required to go further and offer even more convenient methods of voting. Plaintiffs identify two overarching harms that purportedly obligate the county to open more satellite offices: (1) voters waiting in long lines at polling stations, and (2) voters forced to commute long distances to polling stations. Plaintiffs speculate, but do not provide any evidence to support, that these harms may disproportionately affect certain racial minorities. To be sure, the record indicates that, during the 2016 and 2018 presidential general election, Gwinnett County voters were exposed to long wait times. However, the anecdotal problems cited by Plaintiffs that occurred in prior election cycles all took place during general elections, not primaries. On the other hand, Defendants presented evidence that the voter turnout for primary elections is far lower than for general elections, with 156,135 voters in the 2016 primary.[35] Turnout for primary elections where only one major party has a contested battle is even lower. For example, in the 2012 primary election, the total number of voters in Gwinnett County was 79,622.[36]

Moreover, while the Court understands that a long commute or wait in line can be an inconvenience, courts have routinely rejected these factors as a

---

[35]   ECF 11, ¶ 14.

[36]   *Id.*

significant harm to a constitutional right—particularly when there is no evidence of improper intent. For example, in *League of Women Voters of Florida, Inc., v. Detzner*, the Northern District of Florida stated that "some courts have characterized administrative burdens like waiting in line and commuting as not severe." 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). Similarly, in *Common Cause Indiana v. Marion County Election Board*, the Southern District of Indiana categorized difficulties such as longer lines and wait times as "nonsevere, nonsubstantial, or slight burden on the general right to vote as a matter of law." 311 F. Supp. 3d 949, 957–58 (S.D. Ind. 2018), *vacated and remanded*, 925 F.3d 928 (7th Cir. 2019). *See also Jacksonville Coal. for Voter Prot. v. Hood*, 351 F. Supp. 2d 1326, 1335 (M.D. Fla. 2004) ("While it may be true that having to drive to an early voting site and having to wait in line may cause people to be inconvenienced, inconvenience does not result in a denial of meaningful access to the political process. Nor does the Court have the authority to order the opening of additional sites based merely on the convenience of voters.") (citations and internal quotation marks omitted). *Cf. Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016) ("[E]very polling place will, by necessity, be located closer to some voters than to others.").

Plaintiffs also make much of the fact that the Gwinnett BORE submitted a budget request for the necessary funds to open all seven satellite offices during the first week of the early voting period. The evidence shows, however, that the Board of Commissioners did not approve this request. Instead, the Board of Commissioners approved some of the funds, which the Gwinnett BORE allocated to operate all the satellite locations for the second and third weeks of the early voting period. Contrary to Plaintiffs' characterization, Defendants did not approve nor advertise that the satellite locations would be open for the first week of early voting, only to suddenly take those locations away. In fact, satellite locations have never been open in Gwinnett County during the first week of the early voting period.[37] It is simply not the province of this Court to wade into an apparent budgetary dispute between intra-county government agencies and pick sides. *Hood*, 351 F. Supp. 2d 1326, 1332–33 ("It is equally clear that not every decision made by local, state, or federal officials in regards to voting creates a justiciable issue, or leads to a violation of the Constitution or federal or state election laws."). *See also Ohio Democratic Party v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016) ("[O]ur task (especially with respect to minimally burdensome laws) is neither to

---

[37]    ECF 11, ¶ 8.

craft the 'best' approach, nor to impose our own idea of democracy upon the Ohio state legislature."); *Rockford League of Women Voters v. U.S. Nuclear Regulatory Comm'n*, 679 F.2d 1218, 1222 (7th Cir. 1982) ("Government agencies have limited resources to perform their appointed tasks. The courts cannot tell them how to allocate those resources so as to get the most value out of them. That calls for a managerial judgment.").

Plaintiffs also point to the availability of paper ballots as a backup. Defendants' witness, Lynn Ledford, testified that Defendants could not provide the adequate amount of paper ballots for the early voting period during the first week of the early voting period because of the short time frame available and since only certain, approved printers can be used to print the ballots. Regardless, the order relied on by Plaintiffs that was issued by this Court in a prior voting rights case concerning paper ballots only recognizes paper ballots as an acceptable back-up method—not a primary method for recording votes.[38] Moreover, the parties agree that, given the difficulty in obtaining, testing, installing, and training poll workers on the new voting machines, adding a secondary method in which to

---

[38] *See Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1410 (N.D. Ga. 2019).

count ballots (*i.e.*, paper ballots) would only serve to inject more confusion into the system.

Since Plaintiffs' alleged burdens are slight, the Court finds that the regulations at issue are "reasonable, nondiscriminatory restrictions" on the right to vote. At oral argument, Plaintiffs agreed their claim did not rest on discriminatory or racial animus. In fact, it is clear Defendants' decision to operate only one voting location during the first week will impact all Gwinnett County voters equally. According to the record, Defendants made this decision based on budgetary factors and the administrative necessities of implementing new voting machines and training poll workers. The Court finds these to be important regulatory interests made at the local government level based on local government needs. As such, these interests are sufficient to justify the county's decision not to open satellite voting locations during the first week of the early voting period. That decision did not violate the Constitution, as Defendants are not required to maximize the convenience of all voters. *See Ohio Democratic*, 834 F.3d at 629 ("It's as if plaintiffs disregard the Constitution's clear mandate that the states (and not the courts) establish election protocols, instead reading the document to require all states to maximize voting convenience.").

Thus, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits.

### ii. Irreparable Harm

Because Plaintiffs cannot show a likelihood of success on the merits, an extensive discussion of the remaining factors for issuance of a temporary restraining order is unnecessary. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."). Nonetheless, for the second factor, Plaintiffs must show that "irreparable injury would result if no injunction were issued." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).

In the context of elections, courts have held that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed. . . . A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am.*, 697 F.3d at 436. *See also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.").

Here, while Plaintiffs allude to a general constitutional harm that will occur if their request for an injunction is denied, they have failed to articulate any specifics as to that injury. Defendants' decision to operate one voting office for the first week of early voting applies equally to all Gwinnett County voters. There is no indication that this decision was used as a proxy for voter suppression or targeted at a protected class. Plaintiffs also fail to provide any evidence from actual Gwinnett County voters that they will suffer an irreparable injury—*i.e.*, that they will be entirely unable to vote—if limited to only one polling location during the first week of the early voting period. The record actually demonstrates the opposite. For the March 2020 election, Gwinnett County voters will be afforded a greater opportunity to vote early than in any previous year. In fact, Gwinnett County voters will have far more time available and polling locations at which to vote early than required by state law.

This is not a case that is calling into question the very integrity of the electoral process. Simply put, while the denial of the right to vote (or a significant burden on that right) would plainly constitute an irreparable injury, Plaintiffs have presented no evidence that any Gwinnett County voter will be deprived of that right. Therefore, the second factor weighs in favor of Defendants.

### *iii.* **Balance of the Equities**

For the third factor, the Court must analyze whether the "threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party." *Siegel*, 234 F.3d at 1176. Based on the record, the Court finds that the late filing of Plaintiffs' motion for injunctive relief, as well as the administrative infeasibility of its requested relief, weighs against an injunction.

Plaintiffs were first aware of Defendants' decision to only offer one polling location for the first week of the early voting period on January 21, 2020. Indeed, Plaintiffs sent Defendants two letters—on January 22 and February 18—objecting to that decision. Nonetheless, Plaintiffs waited until the night of February 27, 2020—one business day before the early voting period was scheduled to commence—to file their Complaint. Due to this dilatory conduct, any relief the Court could grant would be extremely difficult for Defendants to implement, as the early voting period has already begun.

At the hearing, Ledford testified that to open satellite voting locations, Defendants would have to, among other things, secure the additional locations, install and test the necessary machines, line up additional poll workers to staff the additional locations, and train those workers on the new voting machines. To be sure, the Gwinnett BORE would have to: prepare seven satellite voting locations

by constructing, transporting, and testing hundreds of new voting machines while, at the same time, recruiting, training, and scheduling hundreds of poll workers for those locations. Due to these hurdles, Ledford explained that it would not be reasonably feasible for Defendants to accomplish opening any of the satellite locations this week. Further, Ledford testified that paper ballots, which are intended to serve as a backup method to record votes, are not a feasible alternative, as Defendants could not print a sufficient number of paper ballots to serve the satellite locations prior to the second week of early voting.

Plaintiffs, nonetheless, argue their actions were not untimely because they were serving requests for information and attempting to negotiate with Defendants to reach an amicable solution. While the Court acknowledges this is a laudable goal, Plaintiffs were not faced with a binary choice and should have sought court intervention sooner. This would have permitted Defendants to fully comply with any Court order and significantly alleviated the potential burden. As a result, the Court finds the balance of the equities weigh in Defendants' favor.

### iv.    Public Interest

For the final factor, both Plaintiffs and Defendants have competing interests at stake. For example, courts have found that "allowing for easier and more accessible voting for all segments of society serves the public interest." *Detzner*,

314 F. Supp. 3d at 1224. *See also Obama for Am.*, 697 F.3d at 437 ("The public interest therefore favors permitting as many qualified voters to vote as possible."). However, because States are "primarily responsible for regulating federal, state, and local elections," they have a "strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). Beyond the parties, there is also a public interest in the Court promoting certainty with elections and not entering orders that create "voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006). Given these competing interests, the Court finds that the final factor does not weigh in favor of either party.

Since the first three factors of the preliminary injunction analysis weigh in favor of Defendants, and the final factor is even, the Court finds that Plaintiffs are not entitled to injunctive relief.

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion is **DENIED**.

**SO ORDERED** this the 3rd day of March 2020.

_____
Steven D. Grimberg
United States District Court Judge